IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 11-cv-00304-MSK-BNB

HELEN GRANATO,

        Plaintiff,

v.

THE CITY AND COUNTY OF DENVER;
DENVER HEALTH AND HOSPITAL AUTHORITY;
ILYA KHAZANOV; and
JOEL SIMONSON,

        Defendants.

_____

**OPINION AND ORDER GRANTING, IN PART, MOTIONS TO DISMISS**
_____

**THIS MATTER** comes before the Court pursuant to Defendants Denver Health and Hospital Authority's, Mr. Khazanov, and Mr. Simonson's (collectively, "Denver Health Defendants") Motion to Dismiss **(# 9)**, Ms. Granato's response **(# 23)**, and the Denver Health Defendants' reply **(# 33)**; Defendant City and County of Denver's ("Denver") Motion to Dismiss **(# 10,** as supplemented **# 53)**, Ms. Granato's response **(# 24)**, and Denver's reply **(# 36)**.[1]

**FACTS**

According to the Amended Complaint **(# 6)**, on July 21, 2009, Ms. Granato began experiencing medical difficulties, causing a friend to request assistance via 911. Mr. Khazanov

---

[1] Also pending are several Objections **(# 25, 26, 29, 42, 45)** by the Defendants to rulings by the Magistrate Judge concerning the Defendants' request to stay discovery pending resolution of the instant motions to dismiss. Because this Order resolves the motions to dismiss, any Objections to rulings regarding a stay of discovery pending this ruling are rendered moot.

1

and Mr. Simonson, described in the Amended Complaint as paramedics employed by Denver Health and/or Denver, arrived on the scene. They informed the elderly Ms. Granato that they intended to carry her from her kitchen to the waiting ambulance, but Ms. Granato stated that she was capable of walking without assistance. Despite Ms. Granato's protestations, the paramedics "forcibly grabber her by the arms and legs" and carried her out to the ambulance, causing Ms. Granato to suffer significant pain and bruising. Upon arriving at the ambulance, the paramedics roughly placed Ms. Granato on a stretcher, causing her to suffer additional injuries to her hip.

Once inside the ambulance, the paramedics prepared to give Ms. Granato fluids intravenously, using a large bore needle. Ms. Granato stated that she did not want to have the fluids administered, but Mr. Khazanov nevertheless attempted to insert the needle into Ms. Granato's arm but failed to properly place the needle, causing the fluids to infiltrate into the surrounding tissue in Ms. Granato's arm, causing her additional pain.

Upon arriving at Swedish Medical Center, Ms. Granato was visited by her daughter who, upon seeing her mother's injury, contacted a Denver police officer on duty at the hospital and requested to file a police report charging the paramedics with assault. The police officer, whom the Amended Complaint states "was apparently a friend and coworker of" the paramedics, refused to take the report. Ms. Granato further contends that the Defendants thereafter "conspired . . . to deceive [her]" by falsely amending a trip report "to make it appear as if [her] injuries pre-existed [her] transfer to the ambulance" and to report that Ms. Granato was transferred to the ambulance by Denver Fire Department personnel, rather than by the paramedics.

Ms. Granato's Amended Complaint asserts two causes of action: (i) a multi-faceted claim

under 42 U.S.C. § 1983, alleging that Mr. Khazanov and Mr. Simonson violated her 14th Amendment rights to liberty, self-determination regarding medical treatment, and her liberty interests in being free from assault and battery and false imprisonment; that Denver Health and Denver maintained a custom or policy of permitting such conduct; and that Denver maintains a custom or policy of "conspiring among its various departments . . . to cover up the facts surrounding Plaintiff's claims," depriving her of her constitutional right of access to the courts; and (ii) a claim for common-law negligence against Mr. Khazanov and Mr. Simonson, and a claim that Denver and Denver Health are vicariously liable for that negligence pursuant to C.R.S. § 24-10-109.

The Denver Health Defendants move to dismiss **(# 9)** the claims against them, arguing that: (i) Mr. Khazanov and Mr. Simonson are entitled to qualified immunity, insofar as Ms. Granato does not state a colorable constitutional violation against them simply because she disagrees with how the paramedics exercised their medical judgment in transporting and treating her; (ii) any constitutional right that was violated was not "clearly established" at the time of violation; (iii) Ms. Granato has failed to allege facts sufficient to demonstrate an unconstitutional custom or policy by Denver Health; and (iv) the Court should decline to exercise supplemental jurisdiction over the state law based negligence claim.

Denver moves to dismiss **(# 10)** the claims against it, arguing that: (i) by statutory enactment, it is a separate entity from and maintains no control over Denver Health; (ii) Ms. Granato has failed to identify a constitutional violation committed by Denver, insofar as the paramedics are employees of Denver Health, not Denver; (iii) that any claim premised upon the Denver police officer's refusal to take a report from Ms. Granato's daughter does not state a

constitutional violation insofar as police officers are vested with discretion as to how to perform their law enforcement duties; and (iv) with regard to Ms. Granato's negligence claim against Denver, she failed to file a timely Notice of Claim under the Colorado Governmental Immunity Act, C.R.S. § 24-10-109.

## ANALYSIS

### A. Standard of review

#### 1. Rule 12(b)(6) standard

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all well-plead allegations in the Complaint as true and view those allegations in the light most favorable to the nonmoving party. *Stidham v. Peace Officer Standards and Training*, 265 F.3d 1144, 1149 (10th Cir. 2001), *quoting Sutton v. Utah State Sch. For the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999). The Complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Benefield v. McDowall,* 241 F.3d 1267, 1270 (10th Cir. 2001); *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997). The Court must limit its consideration to the four corners of the Amended Complaint, any documents attached thereto, and any external documents that are referenced in the Amended Complaint and whose accuracy is not in dispute. *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002); *Dean Witter Reynolds, Inc. v. Howsam*, 261 F.3d 956, 961 (10th Cir. 2001).

In *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court clarified what constitutes a "well-pleaded fact" for purposes of a

Rule 12 analysis. A pleader is not required to set forth "detailed factual allegations," but must offer more than "labels and conclusions," a "formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement." *Iqbal*, 129 S.Ct. at 1949. The cases make clear that it is <u>facts</u>, not conclusions, that must be pled; "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," including "legal conclusion[s] couched as a factual allegation." *Id.* at 1949-50.

### 2. Qualified immunity

The doctrine of qualified immunity shields state actors performing discretionary functions from liability in damages unless the conduct they engaged in violated "clearly established" statutory or constitutional rights. *Toevs v. Reid*, 646 F.3d 752 (10th Cir. 2011). When the doctrine is invoked by a defendant, the burden is on the plaintiff to make two separate showings: (i) that the facts alleged (if the motion is made at the pleading stage) or the available evidence (if made at the summary judgment stage) reveals the defendant's violation of a recognized statutory or constitutional right; and (ii) that statutory or constitutional right was "clearly established" at the time of the conduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The Court may examine the two requirements in any order. *Id.* at 236.

For purposes of assessing whether the contours of the violated right were "clearly established," the plaintiff must direct the Court to on-point Supreme Court or Tenth Circuit precedent recognizing the existence and protection of such a right, or demonstrate that the weight of authority in other circuits have found the law to be as the plaintiff maintains. *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010). It is not sufficient for the plaintiff to identify cases that recognize a constitutional right in general or abstract terms; rather, the existing precedent

must be sufficiently "particularized" in its factual similarity to the instant situation that a reasonable state actor, cognizant of the existing precedent, would readily recognize its application to the facts at hand. *Brosseau v. Haugen*, 543 U.S. 194, 198-200 (2004) (identifying the level of particularity needed by extracting the key facts of that case that must be present in sufficiently on-point precedent – "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight"); *Thomas v. Durastanti*, 607 F.3d 655, 669 (10th Cir. 2010).

### B. Claims against Mr. Khazanov and Mr. Simonson

Because Ms. Granato's constitutional claims arise in a somewhat unorthodox set of facts, the Court finds it more efficient to first address the "clearly established" prong on each of Ms. Granato's constitutional claims, and then, having ascertained precisely what the contours of the clearly established constitutional claim might be in such circumstances, turn to the question of whether Ms. Granato's factual allegations are sufficient to allege it. Ms. Granato's response brief identifies two constitutional rights that, she contends, were "clearly established" at the time of the paramedics' conduct: a Fourth Amendment right to be free from unreasonable bodily seizure; and a "right to bodily integrity," presumably arising as a liberty interest under the Fourteenth Amendment.[2]

Turning first to her argument that precedent "clearly establishes" her right to be free from unreasonable seizure under the Fourth Amendment in the circumstances presented here, as

---

[2]Although her Amended Complaint purports to identify other constitutional rights that were allegedly abridged by the actions of the Denver Health Defendants – *i.e.* denial of access to the courts, false imprisonment, etc. – the Court assumes that Ms. Granato's failure to separately address them in her response to the motion to dismiss reflects an abandonment of those claims.

guided by *Brosseau*, it is helpful to isolate the key facts of this case – facts that must be present in any prior precedent that can be said to "clearly establish" the wrongfulness of Mr. Khazanov and Mr. Simonson's acts. For purposes of a Fourth Amendment analysis, those facts are: (i) emergency responders; (ii) encountering a competent individual not otherwise subject to arrest or involuntary detention; (iii) in need of medical assistance; (iv) who refuses to accept the proffered medical assistance; and (v) the responders nevertheless refuse to honor the individual's requests regarding the proffered treatment and instead, forcibly remove and transport the individual. To demonstrate that such a situation clearly establishes a Fourth Amendment violation, Ms. Granato must, at a minimum, direct the Court to case precedent presenting such facts.

Ms. Granato cites to *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989); *Meyer v. Board of County Commissioners*, 482 F.3d 1232, 1239 (10th Cir. 2007), and *Terry v. Ohio*, 392 U.S. 1 (1968). The Court need not engage in a detailed discussion of the facts of each of these cases, as it is clear that none of them address the application of the Fourth Amendment in the "particularized" factual context presented here. None of these cases – nor any other case cited by Ms. Granato – involves the presence of the key facts discussed above.[3] Rather, Ms. Granato's

---

[3]*Meyer* is perhaps the closest case. There, the plaintiff arrived uninvited at a party attended by her former romantic partner, where she began loudly confronting him about physical abuse she had previously suffered at his hands and about threats he had made to kill her. Other guests at the party called police, reporting that the plaintiff was "crazy" and refusing to leave. The police detained, arrested, and eventually committed the plaintiff briefly to a mental hospital for examination, even though she was admittedly non-violent during the confrontation and ensuing detention. The trial court granted qualified immunity to the police on the plaintiff's ensuing Fourth Amendment claim, finding that the law governing what constituted "probable cause" to arrest the plaintiff and subject her to a mental examination was unclear. The 10th Circuit disagreed, finding that the "probable cause" standard in such circumstances clearly required an identification of "facts that lead [police] to believe the person is a threat to herself or others," and that such facts were admittedly not present. 482 F.3d at 1236, 1240.

Arguably, *Meyer* presents facts in which emergency responders were present and

citations all address the contours of the Fourth Amendment in the most abstract and general terms and principles – *i.e.* that "[s]eizure requires an intentional acquisition of physical control" and that "[t]he reasonableness of a seizure requires balancing the individual's Fourth Amendment right to be free from seizure as against the government's interests in the intrusion." As discussed above, the "clearly established" analysis requires a far more focused and particularized examination of existing precedent.

Although Ms. Granato's brief does not cite to any cases clearly establishing a Fourth Amendment claim under the facts presented herein, the Court's own research has revealed some caselaw that addresses this issue. In *Green v. City of New York*, 465 F.3d 65, 68-73 (2d Cir. 2006), the plaintiff was an individual with a debilitating disease, requiring the use of a respirator to breathe. When the respirator briefly stopped working, a family member called for emergency assistance. The family was able to restart the respirator before paramedics arrived, and the individual was later able to repeatedly communicate to the paramedics that he was "ok" and he responded to their questions of whether he wanted to go to the hospital by stating "no, because I [am] fine." Nevertheless, a paramedic concluded that the individual should be transported to the hospital and carried him out to an ambulance. Among other claims, the individual brought a Fourth Amendment claim against the paramedic who removed him.

Although the trial court granted summary judgment to the paramedic, finding his actions

---

physically took the plaintiff into custody, but in all other respects, *Meyer* is so factually distinct from the circumstances presented here that the Court cannot say that a reasonable paramedic, aware of *Meyer*'s facts and outcome, would have recognized its applicability to the situation involving Ms. Granato. Among other things, Ms. Granato was not "arrested" as the plaintiff in *Meyer* was, and thus, the "probable cause" inquiry that is key to *Meyer*'s outcome is not at issue here.

to have been reasonable under the circumstances, the Second Circuit reversed. It found that existing precedent required that "in order to constitutionally seize a person to transport him to a hospital, the person must be dangerous, presumably to himself or others." *Id.* at 83, *citing Glass v. Mayas*, 984 F.2d 55 (2d Cir. 1993). Where the person is otherwise competent, the court explained, "dangerousness to oneself justifying such a seizure does not include a refusal to accept medical treatment." *Id.* Considering the paramedic's contention that this principle was not "clearly established" at the time, the court disagreed, finding that the requirement that seizure and transportation of a competent adult for medical treatment be justified by a showing that "she presented a danger to herself or others" was clearly established by cases such as *Glass*. *Id.*

Were this the only Circuit Court case on-point, this Court might be inclined to conclude that the "weight of authority in other circuits" permitted a conclusion that Fourth Amendment liability for paramedics seizing a conscious-but-reluctant individual in medical need was "clearly established." But there is sufficiently on-point precedent from another circuit that reaches the opposite conclusion.

*McKenna v. Edgell*, 617 F.3d 432, 435 (6th Cir. 2010), involved a man who apparently suffered a seizure in his home, prompting his daughter to call for emergency help. The defendant police officers were the first to arrive on the scene. Although the evidence as to the events that transpired was disputed at trial, a jury's verdict (and, by extension, the 6th Circuit's analysis) credited a version of the events in which the police talked to the man, encouraging him to stand up and put on his pants, and, presumably, submit to medical assistance. The man began to do so, but quickly changed his mind and elected to lie back down on the bed. The police

attempted to physically lift the man up, but he resisted and told them to stop. The police persisted, eventually handcuffing the man and removing him from the premises on a stretcher.

The man eventually sued, claiming, among other things, a Fourth Amendment violation resulting from his restraint, and the jury awarded him damages against the police officers on the Fourth Amendment claim.

On appeal, the police officers sought vacatur of the jury's verdict on qualified immunity grounds. Previously, the 6th Circuit had granted qualified immunity to paramedics who were sued under the Fourth Amendment based on their use of physical force to restrain an individual who was suffering a seizure. *Peete v. Metropolitan Government of Nashville*, 486 F.3d 217 (6th Cir. 2007). In that case, the court had concluded that "there are no cases applying the Fourth Amendment to paramedics coming to the aid of an <u>unconscious</u> individual as a result of a 911 call by a family member." *Id.* at 219 (emphasis added). Heavily influenced by *Peete*,[4] the 6th Circuit in *McKenna* framed the issue of "whether the officers were entitled to qualified immunity" as turning on "whether they acted in a law-enforcement capacity or in an emergency-medical-responder capacity when engaging in the conduct that McKenna claimed violated the Fourth Amendment." 617 F.3d at 439-40. "If the officers acted as medical-emergency

---

[4]This Court might have found *Peete* to be distinguishable from the facts of *McKenna* (and thus not controlling in that case), insofar as the decedent in *Peete* was unconscious during the encounter and thus unable to competently decline the proffered medical assistance, while the victim in *McKenna* was apparently sufficiently conscious and competent to refuse the police officers' offers of help. However, the 6th Circuit in *McKenna* brushed off this apparent distinction. expressly noting that *Peete* had considered and distinguished *Green* on the grounds that the victim in *Peete* was unconscious while the victim in *Green* was capable of competently declining medical assistance. 617 F.3d at 446. The *McKenna* court went on to note that "there was sufficient evidence of McKenna's consciousness," *id.*, thus demonstrating that the consciousness *vel non* of the victim does not control the qualified immunity inquiry as it relates to paramedics.

responders," the court continued, "McKenna's claim would amount to a complaint that he received dangerously negligent and invasive medical care," but that "if any right to be free from such unintentional conduct by medical-emergency responders exists under the Fourth Amendment, it is not clearly established."[5] *Id.* at 440. (The court ultimately concluded that the defendants were acting as law enforcers, not medical responders, and thus were not entitled to qualified immunity.)

When read in conjunction, *McKenna* and *Peete* stand for the proposition that, at least in the 6th Circuit, paramedics who restrain or seize individuals in the course of ostensibly providing involuntary emergency medical treatment are not subject to Fourth Amendment liability; only restraint incident to a law-enforcement-based detention violates the Fourth Amendment. Thus, there does not appear to be any clear "weight of authority" among the circuits on whether the facts presented here violate a "clearly established" Fourth Amendment right; Ms. Granato's claims might proceed were this case lodged in the Second Circuit, but Mr. Khazanov and Mr. Simonson would be entitled to qualified immunity were the case to have arisen in the Sixth Circuit. In the absence of controlling Supreme Court or Tenth Circuit precedent on the issue, Ms. Granato must be able to show a clear precedential trend tipping towards the Second Circuit's view of the issue. Because, at best, there appears to be a sharp split among the circuits on the precise question presented here, this Court is required to conclude that Ms. Granato's Fourth

---

[5]This Court finds the 6th Circuit's use of the word "unintentional" in the preceding quote to be confusing and potentially misleading. The facts of *McKenna* do not suggest that the police officers <u>accidentally</u> handcuffed the man, such that their restraint of him was "unintentional." Rather, the court appears to use "unintentional" in the sense of "not consistent with sound medical treatment." In this sense, "unintentional" appears to be a synonym of "negligent" and the antonym of "wanton."

11

Amendment rights were <u>not</u> "clearly established" in this Circuit at the time of the conduct, such that she can maintain a Fourth Amendment claim against Mr. Khazanov and Mr. Simonson. Accordingly, her Fourth Amendment claim is dismissed on the grounds of qualified immunity.

The Court then turns to Ms. Granato's claim premised on her Fourteenth Amendment "right to bodily integrity." Once again, the Court begins by identifying the facts of this case that are key to such a contention, and then examines the precedent cited by Ms. Granato to determine whether a constitutional right is implicated under those circumstances. Here, Ms. Granato alleges that, once placed in an ambulance, she observed Mr. Khazanov preparing to inject her with a large-bore needle, so as to administer fluids. Ms. Granato states that she informed Mr. Khazanov that she did not wish to have the needle placed in her arm, but Mr. Khazanov disregarded her request. Thus, the key facts presented here are: (i) a conscious, competent, and otherwise free individual, (ii) about to receive medical treatment from a provider, (iii) expressing a desire not to receive such treatment, but (iv) the provider disregards that request and administers the treatment.

In support of her assertion of a Fourteenth Amendment "bodily integrity" claim in these circumstances, Ms. Granato cites to *Cruzan v. Missouri Dept. of Health*, 497 U.S. 261, 269 (1990); *Washington v. Glucksberg*, 521 U.S. 702, 770 (1997); and *Washington v. Harper*, 494 U.S. 210, 229 (1990). Of these three, only *Cruzan* is sufficiently similar to warrant further examination. *Harper* involves an incarcerated person, and the Supreme Court explained that "the extent of a prisoner's right under the [Fourteenth Amendment] to avoid the unwanted administration of [medical treatment] mst be defined in the context of the inmate's confinement," a context that makes it difficult to extrapolate *Harper*'s reasoning to non-incarcerated persons.

494 U.S. at 222. *Glucksberg* involved a challenge by terminally-ill patients to a state law prohibiting assisted suicide; it thus involved persons wishing to <u>obtain</u> access to certain types of medical treatment, not to <u>avoid</u> treatment they did not want to receive. 521 U.S. at 725-26 ("we certainly gave no intimation that the right to refuse unwanted medical treatment could be some-how transmuted into a right to assistance in committing suicide").

In *Cruzan*, the plaintiff was an individual in a persistent vegetative state from whom her guardians sought to withdraw life-support services, but the state refused to honor that wish, citing a state law that required an incompetent person's wish to refrain from lifesaving medical assistance be proven by clear and convincing evidence. The Supreme Court acknowledged a "common-law doctrine of informed consent" that "encompass[es] the right of a competent individual to refuse medical treatment." Wary of making categorical pronouncements in an area of complex and profound factual and ethical concerns, the Court stopped short of squarely recognizing the existence of a similar constitutional right, stating only that "we think the logic [of the common-law doctrine] would embrace a [Fourteenth Amendment] liberty interest," and that "for purposes of this case, we assume that the United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition." *Id.* at 279. (The Court went on to conclude that Missouri's requirement that an <u>incompetent</u> person's wishes in this regard be shown by clear and convincing evidence did not violate any such constitutional right.) Although couched in somewhat tentative and speculative terms, *Cruzan* nevertheless appears to recognize a constitutional right of a competent person to refuse undesired medical treatment.

Mr. Khazanov argues that two cases from the Tenth Circuit repudiate any constitutional

13

violation claimed by Ms. Granato. *Villalpando v. Denver Health and Hospital Authority*, 65 Fed.Appx. 683 (10th Cir. 2003); *Johnson v. Thompson*, 971 F.2d 1487 (10th Cir. 1992). Both cases are inapposite, as both involve individuals claiming constitutional violations premised upon the <u>insufficiency</u> of medical care that was provided to them, not individuals claiming that they <u>refused</u> to consent to medical care that was nevertheless administered. Mr. Khazanov thus evidences a misunderstanding of Ms. Granato's "bodily integrity" claim – she is not contending that her constitutional rights were violated because Mr. Khazanov administered the IV fluids incompetently; she is contending that her constitutional rights were violated because the fluids were administered to her despite her refusal to consent to them. Under these circumstances, the Court is satisfied that cases such as *Cruzan* clearly establish that Ms. Granato had a constitutional right to refuse the proffered treatment, and that Mr. Khazanov's failure to honor her wishes violated that clearly established right.

The Court thus turns to the Amended Complaint to determine whether Ms. Granato has adequately alleged the necessary elements of a *Cruzan*-type violation. The essential elements of a claim of this type require a showing that: (i) Mr. Khazanov was a state actor; (ii) Ms. Granato was competent to express a desire not to receive medical treatment (that is, the IV fluids); and (iii) Mr. Khazanov refused to honor that request and administered the fluids over Ms. Granato's objection. The Amended Complaint adequately alleges each of these elements. *Docket # 6*, ¶ 3, 15, 16. Accordingly, Mr. Khazanov's motion to dismiss Ms. Granato's constitutional claim for violation of her bodily integrity is denied.

The Defendants' sole argument for dismissal of Ms. Granato's second cause of action against them, sounding in negligence, is contingent upon the Court dismissing all of Ms.

Granato's federal claims. Because a colorable § 1983 claim survives against Mr. Khazanov, the Court continues to exercise supplemental jurisdiction over Ms. Granato's negligence claim against both paramedics.

### C. Claims against Denver Health

Denver Health moves to dismiss the § 1983 claims against it, arguing that: (i) Ms. Granato has not alleged a colorable claim against Mr. Khazanov or Mr. Simonson, and thus, the derivative claims against Denver Health should also be dismissed; and (ii) Ms. Granato's allegations of an unconstitutional custom or policy of Denver Health are insufficient, insofar as she has alleged only "a single event where a paramedic apparently assaulted a patient being transported."

For obvious reasons, the Court need only address Denver Health's second contention. Normally, § 1983 claims are only cognizable against the individuals who personally participated in the constitutional deprivation and an entity employing those individuals cannot be held vicariously liable. *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011). However, where a plaintiff can show that the entity maintained a custom or policy of encouraging or condoning unconstitutional actions by its employees, and that such policy was the direct cause or moving force behind the constitutional violation, the entity itself may be liable under § 1983. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 691 (1978); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-85 (1986). At a minimum, a party asserting a *Monell* claim must plead sufficient facts to identify the unconstitutional custom or policy that was promulgated and the means by which that custom or policy caused the constitutional violation. *See e.g. Hollingsworth v. Hill*, 110 F.3d 733, 742 (10th Cir. 1997).

Here, Ms. Granato's allegations of an unconstitutional custom or policy maintained by Denver Health are entirely conclusory. She offers only the "formulaic recitation" of a *Monell* claim, alleging that Mr. Khazanov "act[ed] and/or fail[ed] to act pursuant to City or State policy, custom, decision, ordinance, regulation, habit, usage or practice in [his] conduct," but never identifies precisely what particular custom or policy of Denver Health Mr. Khazanov was acting pursuant to, nor how that custom or policy acted to cause Mr. Khazanov to violate Ms. Granato's constitutional right to bodily integrity. As cases like *Twombly* and *Iqbal* make clear, such conclusory pleadings are insufficient to state a claim.[6] Accordingly, Denver Health is entitled to dismissal of the *Monell* claim against it.

**D. Claims against Denver**

Denver moves to dismiss the claims against it on two grounds. First, it argues that it is statutorily separated from Denver Health and has no control over the actions of Denver Health or Mr. Khazanov, and second, it argues that Ms. Granato failed to give Denver adequate notice of her claims against it.

Turning to the question of whether a § 1983 claim can be brought against Denver on the facts alleged herein, the Court pauses for a moment to clarify exactly what the contours of such a claim might be. As noted above, § 1983 claims must be premised upon the personal

---

[6]Ms. Granato's Amended Complaint makes a halfhearted attempt to illustrate the custom or policy she complains of by making reference to "a similar instance of assault and civil rights violations perpetrated by a Denver Health Paramedic, Alan Miller, against an innocent patient he transported in 2009." Not only does this allegation fail to shed any light on precisely <u>what</u> the custom or policy Ms. Granato references consists of, but the vague and conclusory references to Mr. Miller committing "assault and civil rights violations" gives no indication that the conduct by Mr. Miller is at all similar to the unconstitutional conduct that Ms. Granato has adequately pled against Mr. Khazanov – administration of IV fluids to her over her objection.

participation of a "person" in a constitutional violation, and an entity like Denver is not vicariously liable for a violation simply because it allegedly employs an individual who has committed such a violation. Thus, to the extent Ms. Granato intends to assert a § 1983 claim against Denver, that claim must plead the necessary elements of *Monell* liability – that is, identify a municipal custom or policy maintained by Denver that contributed to the constitutional deprivation she suffered, and identify the means by which that policy caused the deprivation.[7]

The Court has previously found that the Amended Complaint offers nothing more than a purely conclusory, and thus insufficient, allegation of this type against Denver Health. Because the Amended Complaint does not meaningfully differentiate between Denver and Denver Health in its allegations, Ms. Granato thus relies on precisely the same conclusory allegations to attempt to plead a *Monell* claim against Denver, and that claim is equally defective for the same reasons previously stated. Accordingly, the § 1983 claim against Denver is dismissed for failure to state a claim, and the Court need not reach Denver's statutory argument.

Finally, Denver seeks to dismiss the negligence claim against it on the grounds that Ms. Granato failed to comply with C.R.S. § 24-10-109. That statute provides that "Any person claiming to have suffered an injury by a public entity or by an employee thereof while in the course of such employment . . . shall file a written notice as provided in this section within one hundred eighty days after the date of the discovery of the injury." The statute further states that compliance with this notice requirement "shall be a jurisdictional prerequisite to any action."

---

[7]These principles apply with equal force to Ms. Granato's claim of a constitutional violation resulting from Mr. Khazanov's actions, as well as to any claim asserted against Denver based on the refusal of one of its police officers to file a complaint by Ms. Granato's daughter or claims that unknown Denver Fire Department employee falsified records to conceal liability for Ms. Granato's injuries..

The Amended Complaint alleges that "on January 15, 2010, Plaintiff sent a Notice of Claim letter consistent with . . . C.R.S. § 24-10-109 to Defendants." Denver has produced an affidavit attesting to the fact that a search of its records does not reveal any Notice of Claim letter sent by the Plaintiff. Under these circumstances, there is a factual dispute between the parties as to whether adequate notice of the claim was given to Denver. Although Denver's motion to dismiss is captioned as one under Fed. R. Civ. P. 12(b)(6) only, the failure to give timely notice under C.R.S. § 24-10-109 is jurisdictional in nature, giving rise to analysis under Fed. R. Civ. P. 12(b)(1). *Trinity Broadcasting of Denver, Inc. v. City of Denver*, 848 P.2d 916, 924 (Colo. 1993).

Rule 12(b)(1) motions generally take one of two forms: (i) a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction; or (ii) a challenge to the actual facts upon which subject matter jurisdiction is based. *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002), *citing Holt v. United States,* 46 F.3d 1000, 1002-03 (10th Cir.1995). Here, Denver's motion challenges the accuracy of Ms. Granato's allegation that she timely gave a Notice of Claim. Where a Rule 12(b)(1) motion challenges the underlying facts of the case, the Court may not presume the truthfulness of the complaint's factual allegations; rather, the Court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts. *Sizova v. National Institute of Standards and Technology*, 282 F.3d 1320,1324 (10th Cir. 2002). Denver has submitted an affidavit attesting to its belief that no notice was filed by Ms. Granato. Ms. Granato has responded by contending that Denver's affidavit is not properly before the Court, but also requests the opportunity, "to the extent the Court considers [Denver's] affidavit, . . . to traverse the allegations with counterveiling

evidence."

Although neither party has used the appropriate procedural vehicle to address this issue – Denver in failing to identify its motion as seeking relief under both Rule 12(b)(6) and 12(b)(1), and Ms. Granato in failing to recognize the jurisdictional nature of Denver's challenge and her obligation to submit her supporting evidence in conjunction with her responsive brief, rather than requesting leave of the Court to do so in the future – the Court must ensure that both sides are fully heard on the question before the Court resolves it. Within 10 days of the date of this Order, both parties shall submit a brief on the issue of the sufficiency of notice given by Ms. Granato under C.R.S. § 24-10-109, accompanied by <u>all</u> evidence the party wishes the Court to consider on that issue. The Court does not anticipate that responsive briefs will be necessary or appropriate.

Accordingly, Denver's motion to dismiss is granted in part, insofar as the claims against Denver under § 1983 are dismissed for failure to state a claim, and the Court reserves ruling in part, insofar as the determination of whether Ms. Granato's negligence claim against Denver will proceed will be determined following the parties' submission of any additional evidence regarding the timely filing of her Notice of Claim.

## CONCLUSION

For the foregoing reasons, the Denver Health Defendants' Motion to Dismiss **(# 9)** is **GRANTED IN PART**, insofar as all of Ms. Granato's § 1983 claims against Mr. Simonson and Denver Health are **DISMISSED** for failure to state a claim, and **DENIED IN PART**, insofar as the Court finds that Ms. Granato has stated a colorable § 1983 claim against Mr. Khazanov under the Fourteenth Amendment based on his administration of IV fluids to her over her objection,

and the Court will continue to exercise supplemental jurisdiction over the negligence claim against all of the Denver Health Defendants. Denver's Motion to Dismiss **(# 10)** is **GRANTED IN PART**, insofar as the § 1983 claim against Denver is **DISMISSED** for failure to state a claim, and the Court **RESERVES RULING** on that portion of the motion that seeks dismissal of Ms. Granato's negligence claim against Denver pursuant to Fed. R. Civ. P. 12(b)(1), pending the submission of supplemental evidence within 10 days of this Order as set forth herein. The Defendants' various Objections **(# 25, 26, 29, 42, 45)** to discovery rulings by the Magistrate Judge are **OVERRULED AS MOOT**, given that the Court has now ruled on the motions to dismiss.

Dated this 30th day of August, 2011

**BY THE COURT:**

_/s/ Marcia S. Krieger_

Marcia S. Krieger
United States District Judge